# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 675 CAP |
| | : |
| Appellant | : Appeal from the Order entered on |
| | : 06/28/2012 in the Court of Common Pleas, |
| | : Criminal Division of Philadelphia County at |
| v. | : No. CP-51-CR-0933912-1986 |
| | : |
| | : SUBMITTED:   August 29, 2013 |
| RICHARD HACKETT, | : |
| | : |
| Appellee | : |

## OPINION

**MR. JUSTICE STEVENS**                         **DECIDED:   August 18, 2014**

Following our remand in this capital case, the Commonwealth appeals the order of the Court of Common Pleas of Philadelphia County granting Appellee Richard Hackett's petition pursuant to the Post Conviction Relief Act (PCRA).[1]   Upon determining that Appellee has proven that he is "mentally retarded" as defined by this Court in Commonwealth v. Miller, 585 Pa. 144, 888 A.2d 624 (2005), and thus, is exempt from execution in accordance with the United States Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the PCRA court set aside Appellee's death sentence.   As the PCRA court made findings which are not supported by substantial evidence of record and made an error of law by improperly equating borderline intellectual functioning with mental retardation (intellectual

---

[1]  42 Pa.C.S. § 9541-9546.

disability),[2] we reverse the PCRA court's order vacating Appellee's death sentence and dismiss his petition for collateral relief.

## I. FACTS AND PROCEDURAL HISTORY

The Commonwealth charged Appellee with first-degree murder, conspiracy, and related offenses and notified him of its intent to seek the death penalty in connection with the 1986 death of sixteen-year old Maureen Dunne, who was brutally stabbed while she lay sleeping in bed with her boyfriend, Gregory Ogrod.[3] At Appellee's 1988 trial, the Commonwealth presented evidence that Appellee orchestrated a conspiracy to kill the victims with Marvin Spence, James Gray, and Keith Barrett. In the early morning hours of July 31, 1986, three men entered Ogrod's home and repeatedly stabbed the couple and clubbed them with crowbars. Despite this unforeseen attack, Ogrod got up and fought off his assailants. Nevertheless, Dunne died from a stab wound to the heart. As the perpetrators fled, Ogrod recognized Spence as one of his attackers. Appellee, who lived in Ogrod's home, knew Ogrod and Dunne were sleeping in the basement and was the only person, aside from Ogrod and his brother, who had a key to the home.

---

[2] Although the term "mental retardation" was previously accepted by the professional community and routinely employed in decisions reviewing challenges under Atkins, the United States Supreme Court recently approved the replacement of the term "mental retardation" with the more politically correct phrase "intellectual disability" to describe the identical diagnosis. Hall v. Florida, ---U.S.---, 134 S.Ct. 1986, 1990 (U.S. May 27, 2014). The Hall Court noted that the impetus for the shift in its language was the American Psychological Association's decision to implement the new term into the fifth edition of its Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which was published in May 2013. While we acknowledge the change in nomenclature, we note that as this case was litigated before Hall was decided, the parties and their experts used the prior term frequently to distinguish between learning disabilities and mental retardation in order to specifically diagnose Appellee's mental condition. To avoid confusion under these particular circumstances, we will use the terms interchangeably within this opinion.

[3] The facts underlying Appellee's conviction were set forth in this Court's opinion on direct appeal. See Commonwealth v. Hackett, 534 Pa. 210, 627 A.2d 719 (1993).

Although evidence showed Appellee and Spence directed the conspiracy, the men wanted Ogrod killed for different reasons. Appellee's aversion towards Ogrod developed in the spring of 1986 after Ogrod's brother invited Appellee to live in the home he and Ogrod shared. Even though Appellee managed to live there rent free and stored equipment for his landscaping and snow removal business in Ogrod's garage, Appellee did not get along with Ogrod. When Ogrod asked Appellee to move out in July 1986, Appellee threatened to throw Ogrod out of his own home if he did not "cool out." Several days later, Appellee moved all of Ogrod's belongings from his bedroom to the basement without his permission. In contrast, Spence wanted Ogrod killed as a result of a drug-related dispute. Once Appellee and Spence discovered their shared hatred for Ogrod, they worked together to bring their plan to have Ogrod killed to fruition.

Appellee initially sought to hire an assassin to murder Ogrod. Appellee first contacted Edgar Torres to find a hitman "to bump someone off for money." When Torres asserted this task would cost him considerable money, Appellee assured Torres he would pay. Appellee subsequently gave Torres photographs of the victims and met with alleged assassins. Eventually, Torres told Appellee he could not find an individual for the job and refused to participate in Appellee's plan. Appellee and Spence offered another potential hitman named David Carter $5,000 to kill Ogrod and Dunne. While Carter initially agreed to this plan, Appellee and Spence's contract with Carter fell through as the men could not agree on the manner in which Carter would kill the victims.

At trial, several witnesses connected Appellee to the attack on Ogrod and Dunne, which occurred at 4:00 a.m. on July 31, 1986. Jeffrey Horoschak stated that when he called Ogrod's home at 1:45 a.m. that morning, Appellee told him Ogrod was asleep. Edward May testified that at 3:30 a.m., he gave a ride to Spence, Barrett, and Gray to a location near Ogrod's home, where the men met with a fourth individual who resembled

Appellee and drove a truck similar to the one Appellee owned. Appellee's girlfriend, Wendy Rosenblum, testified that, at 5:00 a.m., Appellee called to tell her Ogrod was dead and came to her apartment through the basement, visibly shaking and sweating.

Appellee's subsequent conduct suggested he had facilitated the attack. Rosenblum claimed Appellee asked her to tell police he had been at her apartment all night and ordered her to obtain and destroy the photographs of the victims he had given to Torres to identify the individuals he wanted killed. Rosenblum stated that, a week after the murders occurred, she saw Appellee take a crowbar out of the basement of her apartment, conceal it in his pants, and throw it in a nearby dumpster.

At the conclusion of the trial, the jury convicted Appellee of murder, conspiracy, aggravated assault, and possession of an instrument of crime. At the penalty hearing, the jury found two aggravating circumstances as Appellee conspired to pay another person to kill the victims and created a grave risk to Ogrod during the attack. See 42 Pa.C.S. § 9711(d)(2),(5). Finding no mitigating circumstances, the jury sentenced Appellee to death on July 17, 1988, which this Court affirmed on June 30, 1993. Commonwealth v. Hackett, 534 Pa. 210, 226, 627 A.2d 719, 727 (1993). Appellee filed a PCRA petition on January 14, 1997. After the PCRA court denied the petition, this Court affirmed, and the United States Supreme Court denied certiorari. Commonwealth v. Hackett, 558 Pa. 78, 735 A.2d 688 (1999); Hackett v. Pennsylvania, 528 U.S. 1163, 120 S.Ct. 1178, 145 L.Ed.2d 1086 (2000).

Appellee subsequently filed a habeas corpus petition in federal court.[4] While this petition was pending, Appellee filed his second PCRA petition, seeking relief from his

---

[4] The federal district court granted Appellee's request for a new penalty hearing pursuant to Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). Hackett v. Price, 212 F.Supp.2d 382 (E.D.Pa. 2001). However, the Third Circuit reversed the grant of habeas relief and the U.S. Supreme Court denied certiorari. (continued…)

execution pursuant to Atkins, in which U.S. Supreme Court concluded that the execution of intellectually disabled individuals constitutes cruel and unusual punishment under the Eighth Amendment.[5]  The PCRA Court dismissed Appellee's petition as it felt it could not resolve Appellee's claims while his federal habeas petition was pending.   This Court reversed the PCRA court's decision and remanded for further proceedings pursuant to Commonwealth v. Whitney, 572 Pa. 468, 817 A.2d 473 (2003), in which this Court held a trial court has jurisdiction to address a PCRA petition during the pendency of a petitioner's federal habeas proceedings.

On May 3, 2004, Appellee filed a supplemental PCRA petition to raise a claim pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) after his co-defendant Spence was granted a new trial as a result of the prosecution's discrimination in jury selection.   The PCRA judge, Willis Berry, Jr., granted relief on the Batson claim and dismissed the Atkins claim as premature.   However, this Court reversed the PCRA court's decision as Appellee's Batson claim was untimely filed and remanded for further proceedings pursuant to Atkins.   Commonwealth v. Hackett, 598 Pa. 350, 956 A.2d 978 (2008).

Upon remand, Judge Berry held several hearings on Appellee's Atkins claim from May to November 2011.   The first witness Appellee chose to call was Ms. Judy Pezola, who taught Appellee at the Ashbourne School for children with special needs in her first year of teaching in 1974 after being certified in special education.   Remembering back thirty years, Ms. Pezola recalled that ten-year-old Appellee worked at a first or second

---

(…continued)
Hackett v. Price, 381 F.3d 281 (3rd Cir. 2004), cert. denied, Hackett v. Folino, 544 U.S. 1062, 125 S.Ct. 2514, 161 L.Ed.2d 1114 (2005).

[5] We have jurisdiction over this claim pursuant to the PCRA timeliness exception set forth in 42 Pa.C.S. § 9545(b)(1)(iii) as Appellee's instant petition was filed within sixty days of the U.S. Supreme Court's decision in Atkins, which was filed on June 20, 2002.

grade level and "needed structure and individualized attention to stay focused on his assignments and to work independently." As Appellee was labeled "brain injured," Ms. Pezola claimed "as far as [she] knew, kids who were labeled brain injured were educably mentally retarded." N.T., Atkins Hearing, 5/11/11, at 9-10, 15, 22; Pezola Aff. at 1-2.

On cross-examination, Ms. Pezola admitted Appellee was not labeled mentally retarded and conceded she was "not an expert" when asked to define the terms "brain-injured" and "mentally retarded." Although Ms. Pezola maintained all her students were mentally retarded, she agreed the Ashbourne School accepted children with learning disabilities and emotional issues. When confronted with a report in which she indicated Appellee was "very capable of attending to a task until completion" and "able to structure his time well when working independently," Ms. Pezola claimed she wrote reports in a positive light. In other reports, she stated Appellee "takes great pride in helping other children read" and "acquires new math concepts easily if he's provided with the opportunity to practice and review the material." When asked about developmental delays Appellee claimed to have, Ms. Pezola denied Appellee had issues tying his shoes or going to the bathroom. N.T., Atkins Hearing, 5/11/11, at 22-24, 29-30, 32, 35-36, 42.

Next, Appellee presented the testimony of four mental health experts. Appellee's first expert, Dr. Barry Crown, a neuropsychologist practicing clinical and forensic psychology, opined that Appellee fits within the category of "mild mental retardation." Dr. Crown gave the Wexler adult intelligence scale to Appellee in 2009 after this Court remanded the case for an Atkins hearing more than seven years after Appellee filed his petition. Recognizing individuals with mild mental retardation typically have scores between 50 and 70, Dr. Crown reported Appellee's I.Q. score to be 57. Dr. Crown admitted this score was significantly lower than Appellee's previous I.Q. scores;

Appellee received an I.Q. score of 80 in 1972 (age 8), a score of 85 in 1979 (age 15), and a score of 82 in 1988 (age 23). N.T., Atkins Hearing, 45-46, 52-54, 59, 80-84.

Despite the dramatic drop in I.Q. score, Dr. Crown felt the test he used to evaluate Appellee's Atkins claim was a true measure of Appellee's I.Q and insisted "[t]here was nothing to suggest [Appellee] was attempting to fake this." Dr. Crown believed Appellee did not manipulate his score because the subscale scores displayed homogeneity and Appellee was forthright in his interview. In contrast, Dr. Crown attempted to discredit Appellee's prior scores as "not necessarily as reliable." Dr. Crown criticized the use of the Beta-2 test given to Appellee in prison in 1988, as the test was developed by the army in World War I to approximate I.Q. to screen for "illiterate recruits." Dr. Crown claimed the reliability of Appellee's 1979 score on the Wechsler Intelligence Test for Children - Revised (WISC-R) and his 1972 score on a test given by CORA Services could not be assessed without raw data or supporting information on the tests' administration. Although Dr. Crown observed the WISC-R report was signed by one individual with a Ph.D. and another with a master's degree, he felt it was unclear who gave the test. Moreover, as this test was stamped "obsolete" for unknown reasons, Dr. Crown opined that perhaps this test would have to be repeated to account for developmental changes. N.T., Atkins Hearing, 5/11/11, at 46, 53-54, 59, 64, 80-84.

Although he did not personally evaluate Appellee, Dr. Crown found Appellee had adaptive limitations based on the reports of Appellee's other experts, affidavits from Appellee's family members, the affidavit of Appellee's trial counsel, Atty. Thomas Bergstrom, and the fact that Appellee repeated the first grade three times before enrolled in the Ashbourne School. Dr. Crown relied on the report of Dr. Jethro Toomer, who administered the SIB-R scale which measures adaptive functioning, but did not score this test or testify at trial. Dr. Crown cited to the affidavit of trial expert Albert Levitt who found

Appellee functioned at a nine or ten year old level based on a test in which he required Appellee to draw a house, a tree, and a person. As Dr. Levitt felt Appellee's drawing could be produced by an eight to ten year old child, he opined that his maturity level was consistent with a child of the same age. N.T., Atkins Hearings, 5/11/11, at 65-73; 11/17/11, at 84-86, 205-208.

On cross-examination, Dr. Crown admitted Appellee's first three I.Q. scores were consistent and significantly different than his recent score, but asserted it was mere speculation that this discrepancy was caused by lack of motivation on the recent test. The prosecutor also compared the tests Dr. Crown and Dr. Armstrong administered and noticed Appellee incorrectly answered word problems involving subtraction of single digit numbers but somehow was able to correctly multiply 809 by 47. Dr. Crown found these questions test different skills as word problems involve abstract processing whereas arithmetic does not. N.T., Atkins Hearing, 5/11/11, at 105-107, 123, 177, 185-88.

Admitting his finding that Appellee has adaptive functioning deficits is largely based on affidavits of family members, Dr. Crown expressed no reservation about taking these statements at face value. The prosecutor asked if Dr. Crown had considered that Appellee ran his own business, paid off loans on two trucks, purchased a boat, was the part owner of a beach house, plotted a murder, and sent handwritten grievances to prison officials. Dr. Crown felt Appellee's family helped him run his business, could not confirm Appellee wrote the grievances, and was not persuaded Appellee showed direction in planning the murder.

In a further attempt to cast doubt on Dr. Crown's opinion, the prosecutor presented two of Appellee's recorded phone conversations from prison. In the first, Appellee explained to his mother the concept of short-selling on the stock market and claimed he had used this technique in the past. Dr. Crown felt Appellee's intellectual disability did

not prevent him from engaging in financial transactions. In the second, Appellee informed his sister his lawyers told him to not to go to the law library, talk to other inmates, or make mistakes "Joey Miller" did on death row when he talked about how he was "beatin [sic] the system and… playing the nut role." This information did not change Dr. Crown's opinion that Appellee was being forthright and was motivated to do well on his I.Q. test. Dr. Crown asserted he did not know what Appellee meant by this statement but felt Appellee was "dumb enough to be having such conversations on a monitored phone." N.T., Atkins Hearing, 5/11/11, at 165-66, 171, 175.

Appellee's next expert, Dr. Daniel Martell, a forensic neuropsychologist, testified as an expert for the prosecution in Atkins and for the defense in Miller. Dr. Martell showed concern about the disparity in Appellee's I.Q. scores, but felt the test administered by Dr. Crown was reliable as it was scored correctly and the Mittenberg Index for malingering, which was applied to the score pattern, reported Appellee was being honest. Dr. Martell questioned the validity of Appellee's 1988 Beta-2 test results, as he observed the test was incorrectly scored as Appellee's score should have been 74 and further claimed this test should not be used to assess intellectual disability. However, Dr. Martell disagreed with Dr. Crown's evaluation of Appellee's first two scores, which Dr. Martell found could be legitimate. N.T., Atkins Hearing, 5/12/11, at 16-19.

Although Dr. Martell agreed Appellee had an average I.Q. in his adolescence, Dr. Martell attributed the significant drop in his I.Q. to recreational boxing and exposure to toxins. Noting Appellee's participation in a boxing program from age 14 to 15, Dr. Martell discussed the possible effects of dementia pugilistica ("boxer's brain") and compared Appellee to Mohammed Ali. Dr. Martell also noted Appellee was exposed to chemicals without protective clothing when he used the pesticide malathion in his landscaping

business and worked at his parents' kennel where he coated the puppies' cages with creosote and applied Sevin to kill parasites. N.T., Atkins Hearing, 5/12/11, at 20-24.

Looking to Appellee's adaptive functioning, Dr. Martell claimed Appellee had deficits in five areas: functional academics, self-direction, social and interpersonal skills, self-care, and safety. With regard to academics, Dr. Martell emphasized Appellee repeated the first grade three times in the public school system. Appellee's records from the Ashbourne School, where Appellee was labeled "brain injured," showed he was behind grade level; one report stated Appellee functioned at a sixth grade reading level and a fourth or fifth grade math level at age sixteen. With respect to self-direction, Dr. Martell relied on reports describing Appellee as vulnerable to manipulation and requiring structure and attention to stay on task. With respect to socialization, Dr. Martell pointed to allegations that Appellee had trouble making friends. With respect to self-care, Dr. Martell cited affidavits of family members claiming Appellee wet himself until he was eleven and had trouble tying his shoes. With respect to safety, Dr. Martell recalled family members related the following stories: Appellee held a firework until it blew up, had an accident with a chemistry kit as a child, and injured himself climbing a tree with a chainsaw while intoxicated. Dr. Martell admitted Appellee was able to run a landscaping business that did not require a high level of functioning as his mother claimed to have done the bookkeeping. Dr. Martell's opinion was not affected after hearing Appellee discussing short-selling stocks as Dr. Martell claimed Appellee's intellectual disability causes him to compensate for his mental deficits by trying to appear more competent than he actually is. Moreover, Dr. Martell found Appellee showed poor judgment in talking on the phone about how his lawyers advised him not to use to the prison phone system which records calls. N.T., Atkins Hearing, 5/12/11, at 11-13, 38-42.

On cross-examination, Dr. Martell conceded his theory connecting Appellee's drop in I.Q. to boxing and chemical exposure information was based on Dr. Armstrong's report and his subsequent interview with Appellee's mother a week before trial. Dr. Martell had no specific information about Appellee's boxing program, conceded he did not know if Appellee wore safety gear, and shared Appellee's mother was not aware of an occasion where Appellee was injured or knocked out. Additionally, Dr. Martell claimed the government has banned the use of chemicals Appellee used (malathion, Sevin, and creosote) as such chemicals cause nervous system damage. When discussing Dr. Martell's reliance on the Mittenberg index in finding Appellee had not purposefully manipulated his score, the prosecutor questioned whether this index accounts for lack of motivation. Dr. Martell admitted Appellee had a motive not to do well. N.T., Atkins Hearing, 5/12/11, at 61, 66-68, 71-74, 95-99.

Dr. Martell conceded Appellee was never deemed mentally retarded in his youth but found to be "brain-injured," a term which did not necessarily mean an injury but could have referred to a learning disability. Although some of Appellee's school records indicated he did not have social skills and was a follower who was easily manipulated, the prosecutor presented other reports which indicated Appellee's "outgoing and friendly personality makes him well liked by his peers" and noted "occasionally [Appellee would] manipulate less mature members of the class." Admitting he had "missed" these reports and became "confused" with which records he reviewed, Dr. Martell stated the only records he considered were in Appellee's pleadings. Dr. Martell admitted this information did alter the findings in his report but did not change his opinion. N.T., Atkins Hearing, 5/12/11, at 76, 104-109.

The prosecutor also attacked Dr. Martell's finding that Appellee showed deficits in adaptive functioning as Dr. Martell had never met Appellee but based his report on

portions of school records and affidavits from his family. Although Appellee's family indicated Appellee wet himself and could not tie his shoes in grade school, Dr. Martell admitted none of Appellee's school reports refer to such problems and Ms. Pezola denied Appellee had these issues. Dr. Martell found Appellee had deficits in safety was based on the following reports of family members: Appellee jumped into a waterfall of unknown size, held an exploding firecracker without any documented injuries or subsequent problems using his hands, and had an accident while drunk. Even though Appellee was able to live on his own, run a business, take out truck loans, and buy a beach home, Dr. Martell found Appellee had deficits in self-care. However, Dr. Martell conceded Appellee's adaptive functioning improved over time and was on a divergent course with Dr. Crown's I.Q. results. N.T., Atkins Hearing, 5/12/11, at 114-40.

Appellee's third expert, Dr. John O'Brien, who is both a psychiatrist and a lawyer, opined that Appellee is "mentally retarded," but frankly admitted he authored his report without reviewing Appellee's first three I.Q. scores. However, Dr. O'Brien averred this information did not change his opinion because the Beta test does not properly test for intellectual disability and Appellee's first two scores cannot be validated without raw data. Dr. O'Brien gave Appellee cognitive capacity screening tests which showed Appellee has impaired memory and calculation. Further, Dr. O'Brien felt Appellee has anxiety regarding his cognitive limitations which affects his functioning levels. Dr. O'Brien indicated that in his interview with Appellee, he sensed Appellee was trying to impress him with his knowledge and capabilities. On cross-examination, Dr. O'Brien admitted Appellee's first three I.Q. results were consistent, but repeated he could not assess the reliability of Appellee's 1972 and 1979 tests without the raw data. Nevertheless, Dr. O'Brien conceded he relied on Dr. Crown and Dr. Armstrong's tests without reviewing their raw data. N.T., Atkins Hearing, 5/12/11, at 178-84, 187-192, 218-19, 226-230.

Appellee's last expert witness, Dr. Carol L. Armstrong, the director of the University of Pennsylvania neuropsychology laboratory, testified for the defense in the Miller case. Her evaluation of Appellee in 2010 consisted of forty-five tests that explored cognitive memory processes. As only two of these tests were relevant to I.Q., Dr. Armstrong explained the goal of her testing was to break down Appellee's composite I.Q. score to discover underlying problems. Describing Appellee as having a severe profile of neuropsychological impairment, Dr. Armstrong noted Appellee has intellectual disability marked by deficits in verbal and visual memory, facial perception, arithmetic, and information processing. Dr. Armstrong opined that Appellee has a poor ability to plan his behavior based on his errors on a maze drawing task and found no evidence Appellee was malingering on these tests. Concluding that Appellee exhibits neuropsychological impairment and "mental retardation," Dr. Armstrong asserted her findings were supported by his familial pattern of abnormal neurological development, his poor educational adaptation, and "insults" he experienced in adolescence while boxing and working with chemicals. Dr. Armstrong found Appellee's intellectual disability began prior to age eighteen based on his developmental delay and Mrs. Pezola's claim that Appellee was "mentally retarded." N.T., Atkins Hearing, 11/15/11, at 84, 90-97, 100-108, 113-115.

Agreeing that most individuals with mild mental retardation can live independently, Dr. Armstrong claimed Appellee's intellectual disability did not prevent him from running a business. While Dr. Armstrong admitted Appellee had a high school level vocabulary and filed prison grievances in which he demonstrated correct word usage and grammar, Dr. Armstrong asserted that intellectual disability does not cause an individual to lose his ability to write and speak correctly. Dr. Armstrong's opinion was not affected when she learned Appellee discussed short-selling stocks, as there "was no way to test the

effectiveness … [or] accuracy of what was being said." N.T., Atkins Hearing, 11/15/11, at 128-44.

Dr. Armstrong criticized two aspects of the Commonwealth's expert report, in which Dr. Paul Spangler pointed to disparities in Appellee's performance on similar portions of tests given by Dr. Crown and Dr. Armstrong. Specifically, Dr. Armstrong admitted Appellee performed better on her similarities test after Dr. Crown had administered the same exam, but claimed this was caused by the "practice effect" where Appellee would improve on questions he has seen on a prior occasion. Dr. Armstrong also attacked the Commonwealth's point that Appellee answered more difficult questions on her arithmetic test. Dr. Crown claimed this criticism did not change her conclusion because these tests were not "equivalent"; while Appellee did poorly on word problems that required mental concentration and working memory, he was able to correctly answer basic arithmetic problems. N.T., Atkins Hearing, 11/15/11, at 138-42.

On cross-examination, Dr. Armstrong acknowledged the tests she administered did not measure I.Q. or assess Appellee's adaptive functioning. While Dr. Armstrong found Appellee's performance was consistent with "mental retardation," she admitted that it was also consistent with other brain abnormalities. Dr. Armstrong reiterated the goal of her testing was to validate Appellee's I.Q. and his recent classification as intellectually disabled. After the prosecutor questioned this statement, Dr. Armstrong agreed Appellee had never been previously diagnosed with mental retardation and noted she relied on the observation of Appellee's teacher, Ms. Pezola, who Dr. Armstrong admitted had limited teaching experience and did not know the difference between the terms "brain injured" and "mentally retarded." N.T., Atkins Hearing, 11/15/11, at 150-57.

When the prosecutor noted the discrepancy between Appellee's I.Q. test scores obtained before and after he filed his Atkins petition, Dr. Armstrong asserted that it is

necessary to evaluate Appellee's pre-Atkins test scores in the context of the "Flynn effect," the theory that I.Q. scores on tests with outdated norms may be inflated due to the general rise of the I.Q. scores of a population over time. Although Dr. Armstrong had not discussed the Flynn effect in her report or on direct examination, she asserted Appellee's pre-Atkins scores should have been adjusted for the Flynn effect. Nevertheless, Dr. Armstrong admitted that, even with this adjustment, Appellee's scores were above the range of intellectual disability. While Dr. Armstrong claimed Appellee's exposure to chemicals may have caused brain injury and suggested there are scientific studies exploring the effect of the chemicals Appellee used on the neurological system, Dr. Armstrong admitted these chemicals are commercially available and malathion is used to treat head lice in children. N.T., Atkins Hearing, 11/15/11, at 181-84, 212-15.

The prosecutor attacked Dr. Armstrong's finding that Appellee lacked control of impulsivity based on his failure to complete a maze drawing test without errors. In determining Appellee lacked planning skills, Dr. Armstrong stated she did not find it necessary to consider the facts underlying Appellee's murder conviction because she did not "think these were equally convertible concepts." Similarly, although Dr. Armstrong admitted she had no information on how Appellee planned and organized his landscaping business, she asserted this information was not important in deciding whether Appellee had planning impairment. Dr. Armstrong claimed it was improper to rely on the representations of individuals rather than an objective neuropsychological test. N.T., Atkins Hearing, 11/15/11, 180, 202, 220-21.

Appellee also called his trial counsel, Atty. Thomas Bergstrom, to testify. Atty. Bergstrom claimed Appellee was the "most mentally challenged client [he] ever had" because Appellee was slow in understanding legal concepts. Atty. Bergstrom remembered Appellee played a limited role in his trial and gave no feedback. On

cross-examination, Atty. Bergstrom admitted he did not challenge Appellee's competency to stand trial because he was satisfied Appellee understood the basics of the trial process. Although Atty. Bergstrom vaguely remembered some of the details concerning Appellee's crimes, Atty. Bergstrom admitted he was not familiar with this history as he had not read the trial transcript for twenty-five years. When confronted with a phone conversation Appellee had with his sister while in prison in which Appellee explained Mumia Abdul Jamal's legal position in his own capital murder case, Atty. Bergstrom felt this was not strange as Appellee had twenty-five years on death row to learn the facts of that case. N.T., Atkins Hearing, 5/13/11, at 43, 56, 65.

Furthermore, Appellee's family testified on his behalf. Appellee's paternal aunt, Geraldine Culp, and his maternal aunt, Geraldine Krause, gave similar testimony that Appellee developed slower than their children in reading, tying his shoes, and dressing himself. Both Ms. Culp and Ms. Krause testified Appellee would spend time with younger children. Mrs. Culp believed Appellee wet himself until he was ten and claimed Appellee's mother went to his school when he had an accident. On cross-examination, Ms. Culp was surprised to learn Appellee's school records contained no indication he had trouble going to the bathroom and his teachers documented that Appellee had no fine motor skills problems, was very competitive in school athletics, and was somewhat of a bully. Ms. Krause claimed Appellee had difficulty playing games as he did not understand them and would lose attention quickly. She reported four incidents involving Appellee's judgment as a child: Appellee rode his bike into a creek, accidentally discolored the floor of her home with a chemistry set, knocked down a tent, and on one occasion, did not respond when she yelled for him to get his mother. When the prosecutor asked whether it was abnormal for a twelve-year-old to ride a bike into a creek,

Ms. Krause responded that her daughter "was the same age as [Appellee] and she never did anything like that." N.T., Atkins Hearing, 5/13/11, at 7, 9, 13-15, 21-23, 78, 81-88, 98.

Appellee also relied on the testimony of his mother, Bonnie Hackett. Mrs. Hackett confirmed that she enrolled Appellee in the Ashbourne School after he repeated the first grade three times and indicated Appellee had problems tying his shoes, focusing on tasks such as cooking or doing laundry, and wearing appropriate clothing for each season. Although Appellee ran his business, Mrs. Hackett claimed Appellee's father got him business cards and helped him obtain tools and a truck while Mrs. Hackett kept the finances, made the truck payments, set the prices, and sent invoices. Mrs. Hackett shared that Appellee's brother was diagnosed as "mentally retarded" and his late father had limitations in intellectual functioning. N.T., Atkins hearing, 11/15/11, at 6-7, 25-26.

At several points in her testimony, defense counsel found it necessary to redirect Mrs. Hackett after she discussed Appellee's participation in boxing and his exposure to chemicals when she had not been asked questions related to these topics. Mrs. Hackett asserted she did not want Appellee to join the boxing club as she was worried he would be injured; she related one occasion in which Appellee's ear and eye were swollen and other occasions in which Appellee went to bed at 6:00 p.m. As such, Mrs. Hackett was thankful his participation in boxing did not "last…too long." In addition, Mrs. Hackett expressed concern about Appellee's exposure at the family kennel to creosote, which Appellee would apply to the puppies' cages without a mask or gloves. Mrs. Hackett claimed Appellee used malathion at work without similar precautions. Mrs. Hackett asserted both chemicals were taken off the market and asserted creosote is carcinogenic. N.T., Atkins hearing, 11/15/11, at 10-11, 15-23.

On cross-examination, Mrs. Hackett testified that Appellee was never diagnosed with "mental retardation" but found to have learning disabilities in his youth. While Mrs.

Hackett focused on Appellee's delay as a child in learning to tie his shoes and dress himself, she agreed these problems did not exist when Appellee was eighteen. Although she expressed concern about Appellee's possible brain damage from boxing and exposure to chemicals in his adolescence, Mrs. Hackett admitted she did not allege these facts in her affidavit and was not aware that creosote is, in fact, available for purchase and used commercially. N.T., Atkins hearing, 11/15/11, at 29, 33-38, 45-50.

Describing Appellee as a hard worker, Mrs. Hackett testified that Appellee's business was successful enough to allow Appellee to purchase two trucks by the time he was eighteen years old. Mrs. Hackett agreed Appellee was responsible for scheduling the jobs his employees would complete each day, which included lawn mowing, spraying, and general lawn maintenance. Mrs. Hackett testified she had hoped Appellee could care for himself when she moved to Monroe County in 1985 and Appellee remained in Philadelphia. She claimed Appellee then hired a woman named Heidi Guhl to handle the business finances. As Mrs. Hackett claimed Appellee could not handle financial matters, the prosecutor asked her if she remembered testifying in 1988 that Appellee rented an office for his business because "he needed a place that was quiet, that he had access to, to make out bills and whatnot." Mrs. Hackett did not deny making this statement, but asserted Appellee organized the documents so that she could do his bookkeeping. When asked if Appellee reported income from the stock market, Mrs. Hackett explained Appellee did not take interest in stocks until she had discussed this topic with him while he was incarcerated as a way to make conversation. N.T., Atkins hearing, 11/15/11, at 29, 36-40, 45-50, 61-63, 67-68.

The Commonwealth presented the expert testimony of psychologist Dr. Paul Spangler, the president of the mid-Atlantic region of the American Association of Intellectual and Developmental Disabilities (AAIDD), who found no evidence Appellee

was "mentally retarded." Dr. Spangler's clinical experience includes employment in the 1970's as assistant director of the Elwyn Institute, a facility for individuals with developmental disabilities. In this position, Dr. Spangler had contact with the Ashbourne School which Appellee attended during this period. Dr. Spangler asserted the Ashbourne School did not seek to enroll students with "mental retardation," but specialized in educating children with minimal brain dysfunction, which Dr. Spangler correlated to learning disabilities. N.T., Atkins hearing, 11/17/11, at 8-13, 91, 115.

Dr. Spangler found no reason to discredit the I.Q. scores recorded by the Ashbourne School in 1972 and CORA Services in 1979, as these institutions were respectable sources of information which he had relied on during his career. Dr. Spangler agreed that the Beta-2 test, which the defense felt did not adequately assess intellectual disability, should not be relied on as the sole measure of I.Q., but advocated its use as a screening tool. Even after recognizing the Beta-2 test's weaknesses, Dr. Spangler noted Appellee's score was consistent with his prior two test results, which Dr. Spangler found no reason to discredit. N.T., Atkins hearing, 11/17/11, at 23-24, 44, 65.

Dr. Spangler criticized the defense's reliance on the I.Q. test Dr. Crown gave Appellee in 2009 to evaluate his Atkins claim and found the drop of approximately twenty points in I.Q. was significant. As I.Q. tests are subject to time restraints, Dr. Spangler explained that a person's lack of motivation or effort can lower their I.Q. score. Although Dr. Spangler did not believe Appellee was lying per se on this test, Dr. Spangler felt he was not motivated to do well or perform quickly on a test that results in a death sentence. Dr. Spangler observed Appellee did "noticeably poor[ly]" on timed questions and noted disparity in the speed with which he completed similar sections of I.Q. tests administered before and after he filed his Atkins claim. Dr. Spangler also noted Appellee did better on tests given by Dr. Armstrong, who was not seeking to measure I.Q. As such, Dr.

Spangler questioned the applicability of the Mittenberg index, which is designed to measure purposeful falsification. Dr. Spangler found it "cruel" to give an I.Q. test to a death row inmate and ask him to perform to the best of his ability in hopes he will do well enough to be executed. N.T., Atkins hearing, 11/17/11, at 24-30, 36-48, 52-57, 66, 79.

While Dr. Spangler did not challenge the validity of Dr. Armstrong's evaluation, he asserted that such tests are not used to diagnose intellectual disability and do not produce an I.Q. score. Dr. Spangler noted that none of Appellee's subscale scores related to I.Q. were below the second percentile, which defines intellectual disability. He highlighted Appellee's score in the 75th percentile on the abstract verbal reasoning subtest, which he correlated with an I.Q. of 115, and further indicated Appellee answered sophisticated questions which only people with I.Q.'s in excess of 130 are expected to get correct. Dr. Armstrong rejected the claim that the "practice effect" accounted for Appellee's better performance on Dr. Armstrong's similarities test as she gave him additional questions he had not seen on Dr. Crown's test. Moreover, Dr. Spangler found it improper to attribute the drop in Appellee's I.Q. score to exposure to creosote, Sevin, malathion and Roundup as he was unaware of any scientific articles connecting these chemicals to brain damage. Dr. Spangler also felt there was no evidence Appellee's limited recreational boxing as a fourteen-year old caused any brain damage as Appellee's obtained his highest I.Q. score at age fifteen. N.T., Atkins hearing, 11/17/11, at 50-59, 74-78, 80, 99-101.

With respect to Appellee's adaptive functioning, Dr. Spangler found school records indicated Appellee was progressing normally and contained no reference to problems with skill acquisition or communication. One report described seventeen-year-old Appellee with this phrase: "[d]evelopmental history showed no unusual events and a normal progression in acquisition of skills." Dr. Spangler noted the defense experts did

not give Appellee adaptive functioning tests, but relied on family anecdotes, which Dr. Spangler felt should not be accepted at face value. Dr. Spangler questioned Dr. Crown's reliance on Dr. Toomer's adaptive functioning test, which was incorrectly given and never scored. He also found it improper for Appellee to rely on the "grossly fallacious" claim of expert Albert Levitt who found Appellee functioned at a ten year old level based on his drawing of a tree. N.T., Atkins hearing, 11/17/11, at 83-85, 91-95, 99-101, 208-209, 221.

Dr. Spangler felt Appellee's ability to run his own business and discuss the stock market was advanced and consistent with normal behavior, not intellectual disability. Dismissing the defense's assertion that Appellee talked about stock trading to appear intelligent, Dr. Spangler felt Appellee did not merely mimic other individuals or repeat information, but showed sophisticated cognitive skills as seen in his ability to write prison grievances with correct grammar and sentence structure. Although he admitted individuals with intellectual disability can learn to use mechanical equipment, Dr. Spangler felt such individuals are not often left to operate machinery independently and do not usually run businesses where they are responsible for handling money and keeping track of appointments. Further, Dr. Spangler felt Appellee's crime was not typical of offenses committed by intellectually disabled individuals, which are generally impulsive and show "very little aforethought." N.T., Atkins hearing, 11/17/11, at 85-88, 105-109, 211.

On cross-examination, Dr. Spangler admitted he did not personally evaluate Appellee, but explained that he found no reliable source of evidence of "mental retardation" prior to Appellee's eighteenth birthday and claimed testing would be irrelevant to assess whether Appellee was "mentally retarded" thirty years ago. Further, Dr. Spangler wished to avoid a false evaluation as he did not feel Appellee would give him a fair response when taking an I.Q. test under the duress of the death penalty. Similarly,

Dr. Spangler did not recommend utilizing the Mittenburg index as he questioned its accuracy, but felt Appellee did not show significant signs of purposeful manipulation. While Dr. Spangler emphasized the discrepancy in Appellee's performance on similarities tests given by Dr. Crown and Dr. Armstrong, he conceded Appellee performed similarly on their vocabulary and information tests. N.T., Atkins hearing, 11/17/11, at 136-139, 143-45, 153.

While Appellee was behind grade level every year, Dr. Spangler acknowledged Appellee may have learning disabilities, not "mental retardation," as Appellee's learning advanced at a normal rate after enrolled at the Ashbourne School. With respect to Appellee's adaptive functioning, Dr. Spangler conceded that he did not address in his report Dr. Martell's findings that Appellee had limitations in the area of self-care, self-direction, social interpersonal skills, safety, and functional academics, but felt Appellee had no deficits in those areas. Dr. Spangler confined his evaluation to the tests given and their accuracy. N.T., Atkins hearing, 11/17/11, at 119-20, 158-161.

The Commonwealth elicited the testimony of Heidi Guhl, Appellee's employee who answered his office phone on Saturdays. Ms. Guhl claimed Appellee scheduled his workers, prepared estimates, and operated all of his equipment. Ms. Guhl remembered Appellee did not write checks and paid his employees cash. Although Appellee's family claimed she did the bookkeeping after his mother moved to Monroe County, Ms. Guhl denied these allegations. Ms. Guhl partied at Appellee's beach house because Appellee would buy her alcohol as she was underage at the time. When Appellee was on work release for several burglary convictions, Ms. Guhl claimed that Appellee deceived authorities into allowing him to go to the shore on the weekends as he had maintained he had contracts there. Ms. Guhl admitted she had been charged with possession of drug paraphernalia but denied receiving preferential treatment from the Commonwealth.

Although Ms. Guhl had a close relationship with the victims and expressed hate for the act Appellee committed, she claimed to have no ill feelings against him. As Ms. Guhl felt Appellee's crime was an immature mistake, she was not opposed to the trial court vacating his death sentence. Ms. Guhl did not believe Appellee had intellectual difficulties, but suggested he had anger issues. N.T., Atkins hearing, 11/16/11, at 6, 10, 12-23, 41-49.

After hearing this testimony, the PCRA court determined Appellee's 2009 I.Q. score of 57 placed him in the range of "mild mental retardation" and was satisfied Appellee was not malingering on this test. Finding Appellee's pre-Atkins scores to be "unreliable," the PCRA court indicated Dr. Spangler "could not specifically vouch for the veracity or accuracy of these earlier tests" and had not performed his own testing. In addition, the PCRA court found Appellee had deficits in adaptive functioning as seen in his need to repeat the first grade three times, his developmental delay, anecdotes of Appellee's unsafe behavior, and school reports indicating that he did not make friends easily, was easily manipulated, and required direction. In conjunction with Appellee's exposure to toxic chemicals, his "repeated head injuries," and familial history of limitations in intelligence, the PCRA court found Appellee had proven his intellectual disability by a preponderance of the evidence under the standard set forth in Miller. PCRA Op., 6/8/12, at 6, 7-16, 19.

The Commonwealth appealed, claiming Appellee has not met his burden under Miller and asks this Court to "adopt a more objective legal definition of mental retardation to combat fraud upon the courts." Commonwealth's Brief, at 3. In reviewing a PCRA court's determination of whether a petitioner is intellectually disabled and thus, exempt from the death penalty, our standard of review is as follows:

> A question involving whether a petitioner fits the definition of mental retardation is fact intensive as it will primarily be based

upon the testimony of experts and involve multiple credibility determinations. Accordingly, our standard of review is whether the factual findings are supported by substantial evidence and whether the legal conclusion drawn therefrom is clearly erroneous. We choose this highly deferential standard because the court that finds the facts will know them better than the reviewing court will, and so its application of the law to the facts is likely to be more accurate.

Commonwealth v. Williams, 619 Pa. 219, 223, 61 A.3d 979, 981 (2013) (citing Commonwealth v. Crawley, 592 Pa. 222, 228-29, 924 A.2d 612, 616 (2007)).

## II. ANALYSIS

### A. Review of PCRA court's Atkins determination

Before we examine each party's claims in further detail, it is necessary to set forth relevant precedent to give context to their arguments. After the U.S. Supreme Court issued its pronouncement in Atkins prohibiting the execution of "mentally retarded" individuals, the High Court left to the individual states the responsibility of setting procedures to assess a defendant's claim of intellectual disability. Atkins, 536 U.S. at 317, 122 S. Ct. at 2250, 153 L.Ed.2d 335 (stating "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences"). As our General Assembly has not enacted legislation to set such standards eleven years after Atkins was decided, this Court has exercised its constitutional power of judicial administration in the interim to set forth procedures to implement the Atkins decision in Pennsylvania. Commonwealth v. Sanchez, 614 Pa. 1, 48, 36 A.3d 24, 52 (2011); cert. denied, ---U.S.---, 133 S. Ct. 122, 184 L. Ed. 2d 58 (2012); Miller, 585 Pa. at 155, 888 A.2d at 631; Pa. Const. Art. V, § 10(c).

In Miller, this Court established the prevailing standard for Atkins claims in Pennsylvania: a defendant must show, by a preponderance of the evidence, that he is

"mentally retarded" under the definitions provided by the American Psychiatric Association (APA) or the American Association of Mental Retardation (AAMR), which was renamed the American Association on Intellectual and Developmental Difficulties (AAIDD). Miller, 585 Pa. at 155, 888 A.2d at 631. These clinical definitions are as follows:

> The AAMR defines mental retardation as a "disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in the conceptual, social, and practical adaptive skills." Mental Retardation[: Definition, Classifications, and Systems of Supports 1 (10th ed. 2002) (Mental Retardation)] at 1. The American Psychiatric Association defines mental retardation as "significantly subaverage intellectual functioning (an I.Q. of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." [Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1992) (DSM–IV),] at 37. Thus, ... both definitions of mental retardation incorporate three concepts: 1) limited intellectual functioning; 2) significant adaptive limitations; and 3) age of onset.

Id. at 153, 888 A.2d at 629–30 (footnote omitted). In sum, a defendant may establish "mental retardation" under either the AAMR (AAAID) or APA/DSM–IV definition by showing by a preponderance of the evidence that he has limited intellectual functioning, significant adaptive limitations, and the onset of his subaverage intellectual functioning began before he turned 18 years old. Williams, 619 Pa. at 224, 61 A.3d at 982.

The first prong of this test, significantly subaverage intellectual functioning, is signified through I.Q. scores which are approximately two standard deviations (or 30 points) below the mean score (100). Miller, 585 Pa. at 154, 888 A.2d at 630 (citing Mental Retardation, at 14; DSM-IV, at 39). It is important to note, however, that a low I.Q. score, by itself, is not sufficient to assess "mental retardation" under the DSM-IV and

AAAID definitions. Miller, 585 Pa. at 154, 888 A.2d at 630. The second prong of Miller test requires the individual to show significant deficits in adaptive functioning. Id. Adaptive behavior is defined as the "collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives"; individuals with adaptive behavior limitations struggle in adjusting to ordinary demands of life. Id. The AAAID recommends adaptive behavior be assessed through standardized testing and defines significant limitations in adaptive behavior as performance that is at least two standard deviations below the mean of either in an overall score assessing conceptual, social, and practical skills or within any one of three categories individually. Id. at 154, 888 A.2d at 630-31. In contrast, the DSM-IV requires significant deficits in two of the following categories: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, health, and safety. Id. at 154, 888 A.2d at 630 n. 8.

### 1. Arguments

Pursuant to these standards, the Commonwealth argues the PCRA court erred in determining that Appellee met his burden to prove that he is intellectually disabled and thus, entitled to Atkins relief. The Commonwealth claims historical evidence established before Appellee raised his Atkins claim shows Appellee was not intellectually disabled. In contrast, the Commonwealth contends that Appellee presented speculative testimony from defense experts who conducted intelligence testing decades after Appellee's crimes for the purpose of proving Appellee's Atkins claim in an attempt to convince the PCRA court to vacate Appellee's death sentence.

With respect to the intellectual functioning prong of the Miller test, the Commonwealth asserted Appellee's claim that his I.Q. score is within the range of intellectual disability is false as a matter of law. Noting the threshold score for intellectual disability is 70, the Commonwealth claims the PCRA court erred in ignoring the results of Appellee's early I.Q. tests in which he scored of 82 at age 7, 85 at age 14, and 80 at age 22, which placed Appellee in the low-normal range and above the applicable threshold. Although some defense experts questioned the reliability of these tests, Appellee's own expert, Dr. Martell, admitted these scores were consistent and likely reliable.

Given the precision of his pre-Atkins test scores, the Commonwealth criticizes the the PCRA court's reliance on the self-serving results of Appellee's 2009 I.Q. test, in which he scored a 57. Considering this score to be an outlier, the Commonwealth asserts there is a significant risk that intelligence testing administered for the purposes of Atkins litigation will be skewed and invalid as a defendant has a decreased motivation to perform well when good performance will lead to execution. To support this claim, the Commonwealth cites precedent of other state appellate courts who have recognized that it is necessary to examine a defendant's motivation when assessing intelligence testing given to assess Atkins claims. See Arizona v. Grell, 135 P.3d 696, 702 (Ariz. 2006); Bowling v. Kentucky, 163 S.W.3d 361, 376 (Ky. 2005); Hughes v. Mississippi, 892 So.2d 203, 215 (Miss. 2004); Louisiana v. Dunn, 831 So. 2d 862, 886 n.9 (La. 2002). Although defense expert Dr. Martell asserted the Mittenburg index indicated Appellee was not malingering, the Commonwealth points out that Dr. Martell admitted Appellee had a motive not to do well on his post-Atkins I.Q. test. Further, the Commonwealth argues that the PCRA court erroneously relied on the "Flynn effect" to explain away Appellee's

historical I.Q. results which it claims cannot account for the precipitous loss of twenty-seven I.Q. points after he filed his Atkins petition.

Turning to the adaptive functioning prong of the Miller test, the Commonwealth also contends the PCRA court improperly focused on delays in Appellee's development which he overcame well before he turned eighteen. After Appellee was enrolled at the Ashbourne School, which focused on children with learning disabilities, and not "mental retardation," Appellee's records showed improvement and progression although he was behind grade level. Citing to a portion of the DSM-IV manual which provides individuals with "mild mental retardation" can achieve academically to the sixth grade level, the Commonwealth points to tests indicating Appellee achieved beyond this benchmark.

In contrast, the Commonwealth questions the defense experts' refusal to consider Appellee's adaptive functioning at the time he conspired to commit murder: Appellee lived independently, ran a small business in which he scheduled and paid his employees, rented an office, and purchased and operated vehicles and sophisticated equipment. As Appellee's business was successful, he earned enough money to buy a boat and share ownership of a New Jersey beach home. Additionally, the Commonwealth points to Appellee's manipulation of the "loopholes of life," where Appellee lived at the Ogrod home and stored his business equipment there without paying any rent, used his business to target homes he later burglarized, and deceived authorities to believe he had contracts in New Jersey so that he could travel to the shore on weekends while on work release.

Moreover, the Commonwealth emphasizes that none of the defense experts successfully evaluated Appellee's alleged adaptive functioning limitations through standardizing testing; while Dr. Crown relied on Dr. Toomer's evaluation of Appellee's

adaptive functioning, the defense did not challenge the Commonwealth's assertion that Dr. Toomer's results were invalid as he administered the test incorrectly. Instead, the Commonwealth claims the PCRA court's finding that Appellee had adaptive functioning deficits is based on anecdotes of family members interested in helping Appellee avoid the death penalty and a selective reading of Appellee's school records that ignores evidence of Appellee's improvement, success, and capabilities.

The Commonwealth asserts that the PCRA court's conclusion that Appellee met the third prong of the Miller test and exhibited the onset of "mental retardation" prior to age eighteen is not supported by the record. As Appellee had never been diagnosed as intellectually disabled before he sought Atkins relief and his historical I.Q. results revealed Appellee scored in the low average range of the I.Q. spectrum, the Commonwealth characterizes the defense theories concerning Appellee's drop in I.Q. as speculative. Although defense experts claimed Appellee sustained brain injury from chemical exposure, the Commonwealth argues that none of the defense experts testified to any expertise in this area, cited to any scientific studies which found these specific chemicals to be toxic, or connected Appellee's exposure to his alleged intellectual disability. In addition, the Commonwealth challenges the internal consistency of the defense theories which assert Appellee's I.Q. dropped dramatically while his adaptive functioning improved over time. The Commonwealth also questions the defense experts' adamant refusal to acknowledge that Appellee's drop in I.Q. score could have been caused by his lack of motivation to perform well on a test that will be used to support his execution.

Further, the Commonwealth asserts that the PCRA judge failed to grasp that Appellee was required to prove he was "mentally retarded," and did not merely have

mental impairment, learning disabilities, or another neurological abnormality.[6]   After the prosecutor questioned the defense's reliance on the statements of Appellee's teacher, Ms. Pezola, on this topic, the parties had the following exchange with the trial court:

> [Prosecutor:]   Did you hear [Ms. Pezola] say that she really didn't know if [Appellee] was mentally retarded?
>
> [Dr. Martell:] I heard her say that she thought he was educably mentally retarded.
>
> [Prosecutor:]   Did you also hear her say that she thought all of her students were educably mentally retarded?
>
> Trial Court:   Isn't that the purpose of the school?
>
> [Prosecutor:]   No, your Honor.   It's for learning disabled students.
>
> Trial Court:   Well, they couldn't learn in regular school.   They put them in this school because they had a problem learning.
>
> [Prosecutor:]   They had problems.   They are not mentally retarded. There are other things.   They are learning disabled.
>
> Trial Court:   Look, they had difficulty.   They were challenged students. That's why they were put in here.
>
> [Prosecutor:]   Right.   The point is was he mentally retarded or did he have a learning disability.
>
> Trial Court:   All right.

N.T. Atkins hearing, 5/12/11, 102-103.   A short time later, Judge Berry asked Dr. Martell the following question:   "So [Appellee] spent ten years in the Ashbourne School, which is a school for mentally retarded children?"   Id. at 117.   In emphasizing the relevance of this distinction, the Commonwealth points to the uncontradicted testimony of Dr. Spangler

---

[6]  For this proposition, the Commonwealth cites In re Bowling, 422 F.3d 434, 439 (6th Cir. 2005), in which the Sixth Circuit found a petitioner's adaptive functioning limitations do not show mental retardation where they "are just as indicative of the other psychological disorders from which he suffers as they are of low level intellectual functioning."

who had knowledge of the Ashbourne School's practice of admitting children with learning disabilities, not "mental retardation."

Arguing that the Commonwealth ignores the applicable standard of review, Appellee claims that the PCRA court's conclusion that he is "mentally retarded" is free from legal error and its factual findings are supported by the record. Appellee contends that the Commonwealth has not raised a meritorious claim to warrant overturning the PCRA court's decision as he claims the Commonwealth is simply asking this Court to discount the PCRA court's credibility determinations and disregard the deference owed to the PCRA court's findings of fact.

First, Appellee asserts the PCRA court correctly found Appellee has subaverage intellectual functioning as his I.Q. score of 57 on the test administered by Dr. Crown fell within the range of intellectual disability. The PCRA court found this score was consistent with Appellee's need to repeat the first grade three times, his family history of low intellectual functioning, and his exposure to toxins and "repeated head injuries" as a child. Emphasizing the PCRA court found Dr. Crown's score to be reliable, Appellee points to Dr. Crown's assertion that there was no reason to believe Appellee's score was fraudulent and the fact that all experts, including Dr. Spangler, found Appellee was not malingering. In addition, Appellee notes the PCRA court considered Appellee's previous I.Q. scores, but found such results to be unreliable. Moreover, Appellee emphasizes the PCRA court rejected Dr. Spangler's opinion that Appellee's earlier I.Q. scores should be credited because Dr. Spangler could not vouch for the validity or accuracy of these tests. Although Dr. Martell did not question the validity of these scores, he asserted Appellee's I.Q. had been lowered by neurological insults such as boxing and chemical exposure.

Appellee also claims the PCRA court had ample support to conclude Appellee has significant adaptive deficits. The PCRA court relied on Dr. Martell's opinion that Appellee was impaired in five of the DSM-IV's eleven adaptive functioning categories: functional academics, social and interpersonal skills, self-direction, self-care, and safety. The PCRA court found limitations in functional academics as Appellee repeated the first grade three times and was behind grade level every year at the Ashbourne School. With respect to Appellee's socialization skills, the PCRA court noted school reports and family members indicated Appellee was vulnerable to manipulation and had trouble making friends as a child. In finding Appellee lacked self-direction, the PCRA court relied on Ms. Pezola's observation that Appellee required structure and attention to stay on task. The PCRA court found Appellee had deficits in self-care as he wet himself until he was eleven, could not tie his shoes, and never helped his mother and sister cook or do laundry. With respect to safety, the PCRA court found serious deficits based on the aforementioned family anecdotes of Appellee's unsafe behavior, which includes an incident where Appellee injured himself climbing a tree with a chainsaw while intoxicated.

Appellee notes that the PCRA court found Appellee's ability to work and run a business were not inconsistent with a diagnosis of intellectual disability as his family gave him extensive help in running the business and Appellee's his tasks did not involve high intellectual ability and could be learned through repetition. Appellee points to our decision in Williams, in which this Court upheld the PCRA court's finding that Williams was "mentally retarded" even though he held basic jobs and provided for his family as the DSM-IV and AAMR standards provide that individuals with "mental retardation" can function in society, hold low-skilled jobs, and have strong skills in distinct categories.

Williams, 619 Pa. at 241, 61 A.3d at 992-93.   In the same vein, while the PCRA court noted that Appellee was able to engage in financial transactions and understand some difficult stock trading concepts, the PCRA court accepted Dr. Armstrong's assertion that Appellee's ability to explain an advanced concept did not negate a finding of intellectual disability.

## 2.   Discussion

We begin our discussion by reaffirming the standard that this Court adopted in Miller:   a petitioner seeking Atkins relief has the burden to prove by a preponderance of the evidence that he is intellectually disabled, and therefore, not subject to the death penalty.   The PCRA court, as fact finder, had the responsibility of determining whether Appellee exhibits mild mental retardation or simply suffers from low to borderline intellectual functioning.   While we recognize that the PCRA court's factual findings and credibility determinations are entitled to great deference if they are supported by the record, a PCRA court may not base its decision on speculation derived from testimony it finds credible.   Commonwealth v. Simpson, ---Pa.---, 66 A.3d 253, 259 n. 6 (Pa. 2013). After consideration of all the relevant information, we find the PCRA court's conclusion that Appellee is "mentally retarded" is not supported by substantial evidence.

In determining Appellee exhibits significant subaverage intellectual functioning, the PCRA court dismissed Appellee's pre-Atkins I.Q. tests in which he received scores of 80, 85, and 82 as it found the Commonwealth's expert, Dr. Spangler, "could not "specifically vouch for the veracity or accuracy of these earlier tests."   PCRA Op. at 7. The PCRA court's suggestion that the Commonwealth was required to validate Appellee's normal I.Q. scores ignores the standard of review giving Appellee the burden

to prove his claim of intellectual disability. There is no basis for the PCRA court's assertion that, according to Dr. Crown, Appellee's early test scores would have been "nullified" by factors such as "inconsistent testing conditions, wildly divergent median ranges, and out-of-date testing measures (known as the 'Flynn effect')." PCRA Ct. Op. at 8. Upon our review of the trial transcript, we find no support in Dr. Crown's testimony for any of these findings by the PCRA court.[7]

Moreover, defense experts did not claim Appellee's first two I.Q. scores were inaccurate, but simply noted the accuracy of the tests could not be assessed without the raw data of each test. In an apparent contradiction, Dr. O'Brien, who admittedly had not reviewed Appellee's pre-Atkins results before he prepared his expert report, refused to assess the reliability of these tests but conceded he relied on the results of Dr. Crown and Dr. Armstrong's post-Atkins testing without reviewing the raw data of their tests. Most significantly, Appellee's own experts offered conflicting opinions on whether Appellee's scores demonstrated "mental retardation" or borderline intellectual functioning; while Dr. Crown refused to rely on Appellee's early I.Q. scores and Dr. Armstrong did not comment on the reliability of these tests, Dr. Martell felt Appellee's first two test scores, which were above the threshold of intellectual disability, were reliable.

The defense also acknowledged Appellee was never diagnosed as "mentally retarded" prior to raising his Atkins claim; Dr. Martell found Appellee's label as

---

[7] Dr. Armstrong, however, made a passing reference to the "Flynn effect" on cross-examination to suggest Appellee's pre-Atkins scores be adjusted to account for outdated norms. We express no opinion on whether the Flynn effect is a valid scientific theory as Dr. Armstrong found Appellee's scores, even when adjusted for possible inflation, are above the threshold for intellectual disability. Further, neither party has developed any argument on this topic and Appellee claims the PCRA court's finding with respect to the Flynn effect is "peripheral" to its ultimate ruling. Appellee's Brief, at 43 n.8.

"brain-injured" in grade school did not necessarily denote an injury, but could have referred to learning disabilities. Dr. Armstrong agreed that Appellee's mental impairment was consistent with other neurological abnormalities other than intellectual disability. The only suggestion that Appellee was intellectually disabled came from his teacher thirty years ago, Ms. Pezola, who admittedly did not know the difference between the terms "brain-injured" and "mentally retarded" and generalized all her students at the Ashbourne School into the category of "mental retardation." However, Dr. Armstrong admitted Ms. Pezola had limited experience as she had just begun her first year teaching Appellee's class after receiving certification in special education. Dr. Spangler, the only expert who had knowledge of the Ashbourne School's practices when Appellee was enrolled there in the 1970's, indicated the Ashbourne School specialized in educating children with learning disabilities and did not seek to enroll "mentally retarded" children. While acknowledging that Appellee did repeat the first grade three times, Dr. Spangler pointed out that Appellee's learning advanced at a normal rate after he was enrolled at the Ashbourne School.

Although defense experts agreed that mental retardation can be distinguished from other neurological abnormalities such as learning disabilities, the PCRA court's commentary on the record demonstrated that it believed that all students with problems learning could be characterized as "mentally retarded." In failing to recognize this distinction, the PCRA court improperly equated evidence suggesting that Appellee may have had learning disabilities or another neurological abnormality with proof satisfying Appellee's burden to show significant subaverage intellectual functioning under the first prong of the Miller definition of mental retardation.

After giving no weight to Appellee's scores in the low to normal I.Q. range and the fact that Appellee was never diagnosed with mental retardation until he sought Atkins relief, the PCRA court placed emphasis on Appellee's I.Q. score of 57 obtained seven years after his Atkins petition was filed. Although all experts found Appellee did not purposefully manipulate his score, the PCRA court dismissed Dr. Spangler's suggestion that this score, which was 23 to 28 points lower than previous scores, should be viewed with suspicion as Appellee may not have been motivated to do well on a test leading to his execution. While indicating the Mittenburg index showed Appellee was not malingering, Dr. Martell conceded Appellee had a motive not to do well on post-Atkins testing.

Although Dr. Crown admitted that lack of effort could explain the "substantial" difference in scores, he adamantly maintained there was "no evidence" Appellee did not perform to the best of his ability even after Dr. Crown was confronted with recorded conversations in which Appellee told his sister about another death-row inmate who had played the "nut role" to "beat the system" and shared his lawyers urged him to avoid going to the law library, writing to his family, or talking to inmates believed to be "snitches." As there may be a powerful incentive to malinger and to slant evidence in cases where a petitioner has not been clinically diagnosed with intellectual disability and the record before the factfinder was created to seek relief under Atkins, this Court has found a petitioner's motivation to slant evidence of intellectual disability is a relevant consideration for Atkins factfinders in assessing not only the validity of results of post-Atkins intelligence testing, but in analyzing the entire Atkins petition. Commonwealth v. DeJesus, 619 Pa. 70, 58 A.3d 62, 85-86 (Pa. 2012).

While Dr. Martell accepted Appellee's childhood I.Q. scores outside the range of intellectual disability as reliable, defense experts did not provide adequate support for the theory that the dramatic drop in Appellee's I.Q. was caused by recreational boxing and exposure to toxins. Even though Dr. Martell had no specific information about Appellee's limited participation from age 14 to 15 in a children's boxing program, did not inquire if safety equipment was used, and admitted there was no evidence that Appellee had been injured in this short period, Dr. Martell practically diagnosed Appellee with dementia pugilistica ("boxer's brain") and compared him to fighter Mohammed Ali. When asked if Appellee had been injured in boxing, his mother indicated she could only recall one occasion in which Appellee's ear and eye were swollen and other occasions where he went to bed early. Mrs. Hackett expressed relief that Appellee's participation in boxing "didn't last for .. too long." Based on the foregoing claims, Dr. Spangler felt there was no evidence Appellee's limited recreational boxing as a fourteen-year old caused any brain damage and pointed out that Appellee's obtained his highest I.Q. score at age fifteen on an exam Dr. Martell found was probably reliable. Moreover, as there was no evidence that Appellee was injured in the boxing program, the PCRA court's finding Appellee had "repeated head injuries" is not supported by the record.

In a similar manner, while there is no dispute that Appellee was exposed to creosote, Sevin, malathion, and Roundup in his adolescence, the defense did not show a causal connection between these chemicals and Appellee's drop in I.Q. or his alleged intellectual disability. None of the defense experts claimed to have expertise in this area; Dr. Martell showed a lack of knowledge on this topic when he relied on Appellee's mother's assertion that all of these chemicals had been banned, as Dr. Armstrong

admitted the chemicals were commercially available and indicated that malathion is currently used in shampoo to treat head lice in children. Although Dr. Armstrong claimed that malathion causes a "variety of neurological symptoms" including memory loss and alleged that creosote is carcinogenic, neither Dr. Martell nor Dr. Armstrong could point to any scientific studies or reports which suggest these chemicals could cause significant changes in intellectual functioning levels. As such, the record lacks adequate support for Appellee's theory of a dramatic I.Q. drop in his adolescence.

As noted above, the results of intelligence testing alone are not sufficient to assess intellectual disability as an individual must also show significant adaptive limitations. In assessing the second prong of the Miller test, the PCRA court relied heavily on the opinion of Dr. Martell, who did not interview Appellee or perform any standardized testing, but based his reports on selective portions Appellee's school records and affidavits of his family members. Appellee's main expert on adaptive functioning, Dr. Martell, conceded that he did not have the opportunity to review all of Appellee's school records. Although Dr. Martell emphasized school reports indicating Appellee was easily manipulated, had no social skills, and required support and direction, Dr. Martell candidly admitted he had never seen reports indicating that Appellee himself was manipulative but outgoing and well-liked by his peers and did not mention reports indicating Appellee was capable of completing a task independently in a timely manner. While Dr. Martell emphasized claims from Appellee's family that he could not tie his shoes and wet himself in school until he was eleven, none of Appellee's school records document these issues and Ms. Pezola, who taught Appellee when he was ten, denied he had such problems. Although the PCRA court found Appellee's conduct in climbing a tree with a chainsaw

demonstrated deficits in adaptive functioning, the PCRA court failed to recognize that Appellee was intoxicated during this incident.

Further, the PCRA court did not identify any evidence showing Appellee had significant adaptive limitations in his adolescence or adult life, but limited its review to his developmental delay in early childhood and brushed aside evidence of adaptive skills he developed. By age seventeen, Appellee's school records indicated he was progressing normally and contained no indication he had any problems with skill acquisition, communication, or motor skills. In running his own business, Appellee operated lawn and snow removal equipment and scheduled his employees to provide service to numerous clients. While Appellee's mother claimed to have done the bookkeeping, she admitted Appellee was able to handle financial matters in paying each worker according to a predetermined rate. Before age eighteen, Appellee purchased two trucks for his business and paid off the loans ahead of time. Appellee's success allowed him to open an office and become part-owner of a beach home.

Appellee also showed manipulative behavior, as he lived in the Ogrod home and store his business equipment there without paying rent, used his business to target his clients for burglaries he later committed, and deceived authorities into allowing him off work release to travel to the shore on the weekends where he claimed to have contracts. After Appellee was incarcerated, Appellee showed his strong ability to communicate through well-written prison grievances and demonstrated understanding of stock market concepts and legal precedent in capital cases. We agree that the defense theories seem to be internally inconsistent as Dr. Martell conceded Appellee's adaptive functioning was on "a divergent course" with Dr. Crown's I.Q. results; while Appellee's I.Q. was

supposedly plummeting, his adaptive functioning capabilities improved over time. While Appellee's ability to work and function in society would not necessarily prevent the PCRA court from finding Appellee is intellectually disabled, the record does not include evidence that Appellee had any significant adaptive functioning limitations beyond his early childhood years.

The PCRA court also accepted the defense's claim that Appellee's crime was not relevant to assess his adaptive functioning; Dr. Armstrong found Appellee had deficits in planning his behavior based on his errors on a maze drawing test but indicated it was not important to ascertain how Appellee planned and organized his business and did not find it necessary to consider the facts of Appellee's crimes. However, Dr. Spangler felt that Appellee's crimes were not similar to offenses committed by intellectually disabled individuals which tend to show very little "aforethought." This observation is consistent with the United States Supreme Court's finding in Atkins of "abundant evidence that [intellectually disabled individuals] often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders." Atkins, 536 U.S. at 318, 122 S. Ct. at 2250, 153 L. Ed. 2d 335.

In this case, Appellee planned the attack which ultimately led to Dunne's death. Initially, Appellee arranged to hire a hitman, offered two assassins considerable money, and gave out the victim's pictures to identify his targets. When these plans fell through, Appellee discussed the murder with his co-defendants in advance, drove the men to Ogrod's home in the middle of the night, and directed them to enter the basement of Ogrod's unlocked home where he knew the victims were sleeping. To conceal his participation in the crime, Appellee attempted to fabricate an alibi and destroyed evidence

which included the pictures he gave a potential hitman and a crowbar used in the murder. This crime, which demonstrated Appellee was able to initiate, devise, and lead others in a premeditated plan, was relevant to an assessment of his adaptive functioning but was ignored by the PCRA court.

Based on the foregoing reasons, we find the PCRA court's conclusion that Appellee is intellectually disabled is not supported by substantial evidence. The PCRA court erred in concluding that Appellee met his burden to establish intellectual disability by a preponderance of the evidence when it improperly equated borderline intellectual functioning with "mental retardation" and failed to identify evidence of Appellee's significant limitations in adaptive functioning. Thus, we reverse the PCRA court's finding that Appellee is exempt from the death penalty.

### B.  Assessing the <u>Atkins</u> standard adopted in Pennsylvania

In its second issue, the Commonwealth asks this Court to "adopt a more objective legal definition of mental retardation to combat fraud upon the courts." Commonwealth's Brief, at 3. Claiming the clinical definitions of "mental retardation" set forth in the DSM-IV and AAMR are inherently subjective, the Commonwealth asserts that such definitions are set by "biased organizations that have policy statements against the death penalty" and supported by professional journals that "encourage forensic psychologists to interpret mental retardation as broadly as possible to avoid [a defendant's] execution." Commonwealth's Brief, at 25. While the Commonwealth recognizes this Court declined to recalibrate the three-part <u>Miller</u> standard in <u>DeJesus</u>, the Commonwealth recommends this test be defined as an "objective legal standard" to reduce the possibility of feigned <u>Atkins</u> claims. Specifically, the Commonwealth recommends a petitioner be required to

prove an I.Q. score of 70 or below, establish adaptive functioning limitations by a formal assessment tool, and demonstrate onset before age eighteen, without reliance on affidavits of interested family members or the "creative interpretation" of school records. Commonwealth's Brief, at 43. The Commonwealth also points to a measure taken by the Oklahoma legislature in passing a law that precludes defendants who have received a score of 76 or higher on a standardized I.Q. test from seeking Atkins relief. See 21 Okla. Stat. Ann. § 701.10b(C).

Appellee asks this Court to decline the Commonwealth's request to alter the Atkins standard for several reasons. First, Appellee asks this Court to find this issue waived for the Commonwealth's failure to raise it during the PCRA proceedings or in its statement pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). Second, Appellee finds unfounded the Commonwealth's assertion that clinical definitions are biased towards an anti-death penalty agenda as capital litigation presents a small fraction of the issues employing the assessment of intellectual disability, which extends to a broad array of contexts including, but not limited to, education, the provision of governmental services, and the medical and mental health fields. Lastly, Appellee asserts there is no evidence of fraud in this case that warrants a change in the Atkins standard and claims the Commonwealth failed to show that the current Miller standard is unworkable as PCRA courts are capable of making credibility determinations when presented with conflicting facts and testimony.

Given that the Commonwealth has successfully argued that Appellee failed to prove his intellectual disability by a preponderance of the evidence, it is unnecessary for this Court to evaluate the Commonwealth's request to adopt a more stringent Atkins

framework as Appellee has not satisfied the three-prong standard this Court implemented in Miller. Moreover, while the Commonwealth proposes that this Court should revisit Miller, reject the clinical definitions of intellectual disability, consider adopting cutoff I.Q. scores, and eliminate the petitioner's ability to rely on anecdotal evidence, the Commonwealth's challenge to the existing substantive Atkins standard involves policy concerns that would be more appropriately considered by the Pennsylvania General Assembly.[8] Although this Court was tasked with the responsibility of setting procedures to review Atkins claims in light of the Legislature's inaction, this Court has repeatedly refused to redefine the existing Atkins standard which derives from clinical definitions recognized by the United States Supreme Court in Atkins. See DeJesus, 619 Pa. at 106-107, 58 A.3d 85; Crawley, 592 Pa. at 227, 924 A.2d at 615. Accordingly, we decline the Commonwealth's request to alter the standard for measuring intellectual disability for Atkins purposes in Pennsylvania.

### III. CONCLUSION

For the foregoing reasons, we hold that the PCRA court erred in granting Appellee's petition for relief; accordingly, the PCRA court's decision and accompanying

---

[8] This Court has consistently refused to adopt a "cutoff IQ score" for determining mental retardation, since it is the "interaction between limited intellectual functioning and deficiencies in adaptive skills that establish mental retardation." Crawley, 592 Pa. at 227, 924 A.2d at 615 (quoting Miller, 585 Pa. at 155, 888 A.2d at 631). On a similar note, the United States Supreme Court, by a 5-4 vote, recently struck down Florida legislation which provided that petitioners who had an I.Q. score above 70 had no right to Atkins relief and were precluded from presenting any further evidence of intellectual disability. Hall, ---U.S.---, 134 S.Ct. at 1990. Reasoning this strict I.Q. cutoff violated the Eighth Amendment's prohibition on cruel and unusual punishment, the Hall Court provided that Atkins standards must allow petitioners who score within an I.Q. range accounting for the test's margin of error to present additional evidence of intellectual disability regarding difficulties in adaptive functioning.

order of June 28, 2012, which found Appellee "mentally retarded" and exempt from the death penalty, is hereby vacated.   We remand to the trial court for the reinstatement of the death sentence.   Jurisdiction is relinquished.

Messrs.   Justice Eakin and McCaffery join the opinion.

Mr. Chief Justice Castille joins Parts I, II (A) and III of the opinion.

Mr. Chief Justice Castille files a concurring opinion.

Mr. Justice Baer files a dissenting opinion in which Mr. Justice Saylor and Madame Justice Todd join.