**[J-85-2018] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 760 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Sentence entered on June 16, 2017 |
| | : | in the Court of Common Pleas, |
| v. | : | Lancaster County, Criminal Division at |
| | : | CP-36-CR-0004095-2015.  (Post |
| | : | Sentence Motions denied on June 28, |
| LEETON JAHWANZA THOMAS, | : | 2017.) |
| | : | |
| Appellant | : | ARGUED:  December 4, 2018 |

**CONCURRING OPINION**

**JUSTICE WECHT**                                      **DECIDED:  August 20, 2019**

In this appeal from the judgment of sentence for two counts of first-degree murder and one count of attempted murder, Leeton Jahwanza Thomas challenges several evidentiary rulings which the Majority affirms.  In particular, Thomas challenges: (1) the manner in which the trial court assessed the competency of a testifying victim; (2) the trial court's conclusion that this witness was competent; (3) the trial court's refusal to permit Thomas to introduce the testimony of an expert in the reliability of eyewitness identification; and (4) the trial court's refusal to preclude mention of Thomas' immigration status.

I agree with the Majority's decision to affirm Thomas' judgment of sentence. Nonetheless, on several points underlying that decision, my reasoning differs from the Majority's.  In particular, as I discuss below, with respect to the Majority's sufficiency analysis (Section I), I concur only in the result, as I would hesitate to consider P.S.'s out-

of-court identification of Thomas. As well, I concur only in the result regarding the Majority's conclusion (Section II(A)) that the trial court committed no abuse of discretion in holding a competency colloquy as opposed to a competency hearing or evaluation. With respect to the Majority's conclusions that the trial court's competency colloquy was adequate and that the trial court's competency determination is entitled to deference (Section II(B)), I concur in the result on harmless error grounds. With regard to the Majority's determination that the trial court may have abused its discretion in admitting evidence of Thomas' immigration status (Section IV), I would conclude with certainty that there was an abuse of discretion, but , in light of the entire case against Thomas, this error was harmless. I join fully in Sections III, V and VI of the Majority Opinion.

I turn first to the competency questions, which the Majority discusses in Sections II(A) and II(B). Generally, the competency of a witness is a question for the trial court, whose determination we will not disturb absent an abuse of discretion. *Commonwealth v. Dowling*, 883 A.2d 570, 576 (Pa. 2005). In Pennsylvania, a witness generally is presumed to be competent to testify, and it is incumbent upon the party challenging the testimony to establish the witness' incompetency by clear and convincing evidence. *Commonwealth v. Delbridge*, 855 A.2d 27, 40 (Pa. 2003); *Commonwealth v. Ware*, 329 A.2d 258, 267 (Pa. 1974); *Commonwealth v. Anderson*, 552 A.2d 1064, 1067 (Pa. Super. 1988); Pa.R.E. 601(a). That an individual's mental condition is impaired does not, in and of itself, render that individual incompetent as a witness. *Ware*, 329 A.2d at 267 ("Incompetency does not follow from the fact that the witness is insane or mentally ill."). The competency considerations that apply to an adult witness with the mental capacity of

a child are the same as the competency considerations that apply to a child witness.  *See Id.* at 269; *Anderson*, 552 A.2d at 1068; Pa.R.E. 601(b).[1]

When a witness is more than fourteen years of age, the general rule presuming competency applies.  When the witness is a child under the age of fourteen, however, the general rule presuming competency does not apply.[2]  Rather, when the witness is under the age of fourteen, "there must be judicial inquiry as to mental capacity, which must be more searching in proportion to chronological immaturity."  *Rosche*, 156 A.2d at 310.  Because children are "peculiarly susceptible to the world of make-believe and of suggestions," the trial court must determine "(1) such capacity to communicate, including as it does both an ability to understand questions and to frame and express intelligent answers, (2) mental capacity to observe the occurrence itself and the capacity of remembering what it is that [the witness] is called to testify about[,] and (3) a consciousness of the duty to speak the truth."  *Id.*; *Commonwealth v. Penn*, 439 A.2d

---

[1]     The rule codifies this alignment as follows:

A person is incompetent to testify if the court finds that because of a mental condition or immaturity the person:

(1) is, or was, at any relevant time, incapable of perceiving accurately;

(2) is unable to express himself or herself so as to be understood either directly or through an interpreter;

(3) has an impaired memory; or

(4) does not sufficiently understand the duty to tell the truth.

Pa.R.E. 601(b).

[2]     *Rosche v. McCoy*, 156 A.2d 307, 310 (Pa. 1959); *see Commonwealth v. Walter*, 93 A.3d 442, 451 (Pa. 2014) ("[w]here a child under the age of 14 is called to testify as a witness, the trial court must make an independent determination of competency. . . ."); *Commonwealth v. Smith*, 167 A.3d 782, 789 (Pa. Super. 2017) ("[t]he presumption does not arise where a child witness is under age fourteen").

1154, 1158 (Pa. 1982); *see also Commonwealth v. Fultz*, 462 A.2d 1340, 1343 (Pa. 1983). "[W]here a child under the age of 14 is called to testify as a witness, the trial court must make an independent determination of competency." *Commonwealth v. Walter*, 93 A.3d 442, 451 (Pa. 2014).

Accordingly, the jurisprudence of this Commonwealth suggests a straightforward syllogism. The same competency considerations apply to witnesses who are intellectually disabled as apply to children under the age of fourteen. Children under the age of fourteen are not presumed to be competent, but must be subjected to an independent judicial determination of competency. Therefore, it would appear that witnesses who are intellectually disabled likewise are not presumed to be competent, but must have their competency judicially established.

Competency may be established be through a competency colloquy, during which the trial court can consider the witness' responses to specifically targeted questions, complemented by the court's own observations of the witness, including the witness' demeanor, alertness, thoughtfulness, sincerity, and general responses and testimony. *Dowling*, 883 A.2d at 577. If the trial court's observations of the witness leave the court with doubts about the witness' competency, the trial court may conduct a competency hearing or, if warranted for compelling reasons, a competency investigation. *Commonwealth v. Koehler*, 737 A.2d 225, 239 (Pa. 1999); *Commonwealth v. Kosh*, 157 A. 479, 482 (Pa. 1931); *Commonwealth v. Alston*, 864 A.2d 539, 549-50 (Pa. Super. 2004).

Here, the trial court chose to conduct a competency colloquy, after which it concluded that the witness, P.S., was competent. Ultimately, I agree with the Majority

that the trial court enjoyed the discretionary authority to assess competency through a competency colloquy rather than, as Thomas requested, a competency hearing or a competency investigation. Nonetheless, I am uneasy in two respects with the manner in which the trial court established competency in this case.

First, our precedent regarding the defendant's burden to establish a witness' incompetency is not clear. Because the competency considerations are the same when the witness is under the age of fourteen and when the witness has the mental capacity of a child, and because competency in these scenarios is not presumed but must be established through a searching judicial inquiry, I question whether the burden remained on Thomas to establish P.S.'s incompetency.

To the extent that the burden remained with Thomas, I question how Thomas could meet it. Doing so would require Thomas to establish that P.S. did not have the capacity to communicate, including the ability to understand questions and to express intelligent answers; to establish that P.S. lacked the mental capacity to observe the occurrence itself; to establish that P.S. lacked the capacity to remember the facts about which she was called to testify; or to establish that P.S. was not conscious of her duty to speak the truth. *See Rosche*, 156 A.2d at 310.

But if the decision of competency is developed solely through the trial court's own observations of the witness, rather than through the production of evidence or questioning by counsel, how does a defendant establish the witness' incompetency to testify? Placing the burden upon the defendant while providing no opportunity to sustain this burden effectively provides only an illusory opportunity to demonstrate incompetency. The precedent of this Commonwealth provides no guidance on this question.

Second, in addition to providing limited guidance to defendants attempting to demonstrate a witness' incompetency, our precedent likewise provides scant instruction for trial courts in determining how to assess competency. A court is not required to hold a competency hearing merely because the defendant requests it. And, as the Majority correctly observes, a trial court is not required to order an investigation of a witness' competency unless the trial judge has some doubt about competency after having observed the witness. Maj. Op. at 8; *Commonwealth v. Counterman*, 719 A.2d 284, 295 (Pa. 1998). But our precedent does not suggest when a hearing, rather than a colloquy, is warranted, or what proffer the defendant is required to make in order to obtain either of them.

These concerns animate my discomfort with the trial court's denial of Thomas' request for a competency hearing in this case. Thomas initially requested a competency hearing following his receipt of discovery indicating that P.S. suffered from a multitude of developmental limitations, physical and mental handicaps, and a learning disability, as well as a report that P.S. was described as being "a few years behind" in terms of mental capacity. Motion for Competency Hearing and Related Discovery, 3/6/2017 at 2. After Thomas received P.S.'s educational records, Thomas filed a supplemental motion for a competency evaluation, informing the court of P.S.'s intelligence quotient ("I.Q.") and requesting a defense evaluation of the witness.

The Majority affirms the trial court's denial of these requests, opining that Thomas did not demonstrate "a compelling need" for a competency hearing or the necessity for an evaluation by a defense expert. Maj. Op. at 9. I question again how Thomas could have demonstrated such a "compelling need" for a competency hearing. The records

that Thomas was able to obtain suggested that P.S.'s competency as a witness was questionable. Without a hearing or further discovery, what means could Thomas deploy to demonstrate the "compelling need" burden that the Majority imposes?

When Thomas gained access to P.S.'s educational records, he learned that P.S. had an I.Q. of forty-six. The Majority holds that this information failed to demonstrate "the necessity" for the requested defense examination. Maj. Op. at 9. This may be so, but, again, I am left to wonder what would establish the necessity for a defense examination of the witness in the absence of a pretrial competency hearing, which the trial court also had denied.

Evidence that P.S. had an I.Q. of forty-six certainly constituted credible evidence that P.S. was or might be intellectually disabled. In our capital jurisprudence, for example, a capital defendant attempting to demonstrate his ineligibility for the death penalty on the grounds of intellectual disability would have to establish significantly sub-average intellectual functioning.[3] For such a capital defendant, this is established through I.Q. scores that are approximately two standard deviations (or thirty points) below the mean score of one hundred. *Hackett*, 99 A.3d at 27.[4] Although there is no "cut-off I.Q." for intellectual disability, because it is the interaction between limited intellectual functioning

---

[3] The standards set forth in the Diagnostic and Statistical Manual of Mental Disorders and by the American Association on Intellectual and Developmental Disabilities require the defendant to have: (1) limited or sub-average intellectual functioning; (2) significant adaptive limitations; and (3) an age of onset prior to his or her 18th birthday. *Commonwealth v. Mason*, 130 A.3d 601, 653 n.61 (Pa. 2015); *Commonwealth v. Hackett*, 99 A.3d 11, 27 (Pa. 2014); *Commonwealth v. Gibson*, 925 A.2d 167, 169 (Pa. 2007).

[4] *See also* Courtney Johnson, *"Moore" than Just a Number: Why IQ Cutoffs Are an Unconstitutional Measure for Determining Intellectual Disability*, 91 S. CAL. L. REV. 753, 761 (2018).

and deficiencies in adaptive skills that establish intellectual disability, *Commonwealth v. Keaton*, 45 A.3d 1050, 1080 (Pa. 2012), an I.Q. score between seventy and seventy-five, together with significant deficits in adaptive functioning, places a defendant in the mild intellectual disability range. *Commonwealth v. Williams*, 61 A.3d 979, 992 (Pa. 2013). Moreover, the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, fifth edition, ("DSM-5") designates classifications of intellectual disability into degrees: profound (I.Q. below twenty to twenty-five), severe (I.Q. of twenty to twenty-five through thirty-five to forty), moderate (I.Q. of thirty-five to forty through fifty to fifty-five), and mild (I.Q. of fifty to fifty-five through seventy to seventy-five).

Because evidence that P.S. had an I.Q. of forty-six suggested that she was or might be intellectually disabled, it was incumbent upon the trial court to assess the witness' competency. My misgivings about the state of our precedent arise from its lack of clarity: we impose the burden upon a defendant to establish the incompetence of a Commonwealth witness while, at the same time, failing to provide guidance or the means to do so effectively. I cautiously conclude that, as our law now stands, the trial court here had the discretion to assess competency, and the need for a further hearing or evaluation, at a competency colloquy.

But this only begs the next question. What about the colloquy itself? The Majority holds that the trial court committed no abuse of discretion in either the manner in which it conducted the competency colloquy or in its conclusion that P.S. was competent to testify. Maj. Op. at 15-16. I am unable to agree with either of these conclusions.

The trial court was bound to examine P.S.'s capacity to communicate, including her ability to understand questions and to frame and express intelligent answers. The

competency colloquy reveals that P.S. repeatedly struggled to provide audible, verbal answers to many of the questions asked by the trial court and by counsel for both the Commonwealth and Thomas. Although the trial court later explained that it had no difficulty understanding P.S., the court did not focus its inquiry in any respect upon P.S.'s ability to communicate intelligently.

Nor did the trial court inquire in any respect into P.S.'s mental capacity to perceive the occurrence itself. With respect to P.S.'s capacity for remembering what it was that she was called to testify about, P.S. indicated in the affirmative that she would be able to answer questions about what she remembered from the night she was stabbed. When defense counsel asked whether P.S. remembered that night, she indicated that she did, "kind of, sort of." Notes of Testimony ("N.T."), 6/8/2017, at 253. When P.S. answered that she "kind of" was able to tell time, the trial court sustained the Commonwealth's objection. *Id.* The trial court also sustained the Commonwealth's objection to defense counsel's inquiry into whether P.S. could recall what she was doing the prior Monday. *Id.*

By sustaining the Commonwealth's objections, the trial court appears to have denied the defense a full and fair opportunity for cross-examination, while simultaneously giving the Commonwealth free rein in the scope of its own questioning of P.S. By hamstringing the defense's ability to participate in the colloquy through meaningful cross-examination, the trial court ensured that Thomas would be unable to meet his burden of establishing incompetency. This limitation of cross-examination was particularly problematic here because the trial court had denied the request for a competency hearing: Meaningful cross-examination was the only means by which Thomas could probe further into P.S.'s competency. It was not the content of any particular answer to

the question about whether P.S. remembered what she was doing last Monday, for example, that would have been directly relevant (as nothing that happened that Monday was alleged to be relevant to the case). Rather, P.S.'s answer to this question may well have been revealing in and of itself, or may have led to further questioning regarding P.S.'s ability to recall past events with accuracy. The trial court should have permitted trial counsel the latitude to explore such door-opening questions. Its failure to do so was, I believe, an abuse of discretion.

Finally, the trial court limited examination of P.S.'s consciousness of the duty to speak the truth. P.S. acknowledged through one or two word answers that, if something is not the truth, it would be a lie, and that, if the trial court stated that the prosecutor was wearing an orange suit, this too would be a lie. N.T., 6/8/2017, at 266-67. P.S. also promised to tell the truth. When defense counsel attempted to ask whether P.S. understood what was meant when she gave an oath to tell the truth, the trial court sustained the Commonwealth's objection, stating that it was satisfied that P.S. understood the difference between the truth and a lie and that P.S. had promised to tell the truth. *Id.* at 252. The trial court did not ask whether P.S. understood why it was important to tell the truth. If the burden remained solely with Thomas, then his counsel's ability to engage in meaningful cross-examination was paramount. By limiting defense counsel's door-opening questions, the trial court precluded the only way in which Thomas possibly could meet his burden to prove that the witness was not competent. If the determination of competency is within the trial court's discretion and is a product of the trial court's own observations of the witness, then failing to permit counsel to engage in

meaningful cross-examination undermines the deference to which the trial court's decision otherwise would be entitled.

The trial court failed to conduct a searching judicial inquiry, and failed to afford defense counsel the latitude that would be necessary to sustain Thomas' burden of demonstrating incompetency (if, indeed, the burden remained with Thomas under these circumstances). Under these circumstances, the appellate court cannot reliably defer to the trial court's finding that the witness was competent. To be sure, it is possible that P.S. was competent to testify; the record that the trial court has given us here simply is insufficient to allow us to make that determination.

Nonetheless, it is well-settled that a trial error is harmless when the appellate court is convinced beyond a reasonable doubt that the error could not have contributed to the verdict. An error will be deemed harmless if: "(1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Commonwealth v. Mitchell*, 902 A.2d 430, 457 (Pa. 2006) (quoting *Commonwealth v. Robinson*, 721 A.2d 344, 350 (Pa. 1998)). The Commonwealth bears the burden to prove harmlessness beyond a reasonable doubt. *Id.*

Although identification by an eye witness (here, P.S.) is compelling evidence of guilt, if we put it aside for the moment we must nonetheless conclude that the remaining evidence against Thomas was overwhelming. As the Majority ably recounts in its

sufficiency analysis, the record established Thomas' motive for the murders and attempted murder, as Thomas was charged with assaulting two of Lisa Scheetz's daughters and was scheduled to be arraigned just two weeks later. In addition, the Commonwealth obtained DNA evidence from one of the victims on Thomas' shoe, and introduced evidence of the clothing and rope found in bleach water at Thomas' house, the gloves and camouflage cloth that had clogged Thomas' toilet, as well as evidence that two bloodhounds independently tracked a trail from the crime scene to Thomas' residence. Considering the totality of this overwhelming evidence of Thomas' guilt, I would conclude that the trial court's error in finding P.S. to be competent was harmless.[5]

I turn now to Thomas' argument that the trial court abused its discretion when it permitted the Commonwealth to introduce evidence that Thomas may have been subject to deportation, an issue that the Majority resolves in Section IV. In April 2015, Thomas was charged with sexual assault for molesting two of Ms. Scheetz's daughters. At the time, Thomas was a lawful immigrant and green card holder. Apparently, the Commonwealth believed that, if Thomas was convicted of the sexual assault charges involving Ms. Scheetz's daughters, he would not only be subject to the direct criminal consequences of a conviction, including incarceration, but could also be subject to

---

[5] Although P.S. identified Thomas as her assailant shortly after the murders and assault, I would not rely on this evidence (either as part of the Majority's sufficiency review in Section I or pursuant to my harmless error analysis) because of my skepticism about P.S.'s competency. Testimonial competency requires mental capacity at the time of the events to which the witness testifies. *Ware*, 329 A.2d at 268. As set forth above, the ability to perceive is an essential element of testimonial competency. *Id.* A witness' testimony must be supported by her capacity to have observed the occurrence and to remember the relevant facts. *Rosche*, 156 A.2d at 310-11. In this case, I am unconvinced of P.S.'s testimonial competence and, for the same reasons, would not afford her out-of-court statements any weight in our appellate review.

deportation. Thomas was scheduled to be arraigned on the sexual assault charges on June 26, 2015. The murders were committed on June 11, 2015.

Over defense counsel's objection, the prosecutor presented argument to the jury that, had Thomas been convicted of the sex offenses, he could have been deported to Jamaica. Pennsylvania State Police Corporal Todd McCurdy also made mention of this collateral consequence in his testimony. N.T., 6/12/2017, at 661-662.

In its subsequent opinion, the trial court explained that the possibility of deportation was a key piece of evidence of Thomas' motive for the murders and attempted murder. Because Thomas committed the murders before he was arraigned on the sexual assault charges, the trial court believed that this "clearly establishes [Thomas'] motive for the killing." Tr. Ct. Op. at 5. Today's Majority approves, holding that "there was sufficient ground to establish [Thomas'] immigration status and potential deportation was a possible motive, among other possible motives to commit the killings." Maj. Op. at 23. Though the Majority agrees that this evidence was probative, it simultaneously faults Thomas for failing to establish the prejudicial impact of this evidence. *Id.* at 22. On both points, I disagree.

Undoubtedly, immigration status is potentially relevant to motive.[6] But that is not the end of the matter. Relevant evidence may be excluded "if its probative value is outweighed by a danger of . . . unfair prejudice." Pa.R.E. 403. In this case, the marginal probative value of this evidence was outweighed by the potential of unfair prejudice.

---

[6] *See Commonwealth v. Philistin*, 53 A.3d 1, 16-17 (Pa. 2012) (holding that the appellant's immigration status was relevant to show that he had a motive to shoot the officers, lest he be deported, even if the Commonwealth emphasized other potential motives).

The probative value of this evidence was based purely upon speculation. There was no evidence whatsoever to establish that Thomas' immigration status and potential deportation was, in fact, a motive, or even a possible motive. Evidence of motive must entail sufficient basis to believe that the crime actually grew out of or was in some way caused by the prior set of facts and circumstances. *See, e.g.*, *Commonwealth v. Schwartz*, 285 A.2d 154, 158 (Pa. 1971). By contrast, argument and testimony that Thomas committed the murders to avoid possible deportation that may have resulted as a consequence of conviction on the sexual assault charges is purely speculative. There was no evidence at this trial indicating or suggesting that the murders actually grew out of or were in some way caused by Thomas' concern over possible deportation.

As the Majority observes, the Commonwealth could have presented evidence that Thomas was aware of the deportation consequence of being convicted of the sexual assault charges. Maj. Op. at 24. It presented none. Instead, the Commonwealth now simply asserts that, as a green card holder, Thomas would have known of the conditions of his residency, and the possibility of deportation if he was convicted. This may very well be true. But we are a court, not a street corner. We deal in evidence, not speculation. The Commonwealth introduced no evidence to substantiate its speculation. Presumably, and without insuperable difficulty, the Commonwealth could have presented evidence that, for example, all green card holders are informed of the deportation consequences of a criminal conviction. It was incumbent upon the Commonwealth to link the putative deportation consequences to the murders through something more than guesswork.

The Commonwealth cannot manufacture a motive and attribute it to a criminal defendant without any evidentiary basis. Yet this is exactly what the Commonwealth did

in this case. There may be — and there often are — collateral consequences that result from a criminal conviction. It does not follow that the Commonwealth can assert without basis that those consequences were the motive for a subsequent crime. In addition to possible deportation proceedings, a number of other collateral consequences may ensue from a criminal conviction. For example, a criminal defendant may lose the right to vote, may be subject to reporting obligations following incarceration, may have difficulty obtaining employment or housing, may forfeit a professional license, may lose the right to own a firearm, may suffer the loss of public benefits or student loans, and may become ineligible for jury duty. This list of possibilities does not empower the Commonwealth to stand before a jury and argue that the defendant committed a crime in order, for example, to avoid losing the right to vote that would have resulted from a conviction for a prior crime. Avoidance of a lengthy term of incarceration is motive aplenty, without resort to unfounded speculation that the defendant was extra-motivated to commit the subsequent crime to avoid various collateral consequences that also would attach. Even granting the Commonwealth the benefit of the doubt that Thomas' immigration status bore some potential relevance, its speculative connection to the facts renders its probative value marginal at best.

By contrast, the danger of unfair prejudice resulting from evidence of Thomas' immigration status was high. Although the Majority is correct that Thomas has not developed the basis for his assertion of prejudice, *see* Maj. Op. at 22, I disagree that the prejudicial impact of this evidence is not self-evident. To the contrary, by parading a Jamaican national's immigration status in front of the jury without any basis to suggest that this factored into the defendant's motive, the Commonwealth introduced an argument

that reasonably could be perceived as pandering to or capitalizing upon the potential of anti-immigrant sentiment. Under these circumstances, we should have little hesitation in concluding that the danger of prejudice outweighed the marginal probative value. Nonetheless, and notwithstanding these infirmities, it cannot be doubted that the evidence of Thomas' guilt was overwhelming. Accordingly, this error, too, was harmless. Accord Maj. Op. at 22.

Subject to all of the disagreements that I have discussed above, I concur in the Majority's affirmance of Thomas' judgment of sentence.